# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **RICHARD RIDDLE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:10-cv-0578** |
| **v.** | ) | |
| | ) | |
| **FIRST TENNESSEE BANK and** | ) | **JUDGE SHARP** |
| **FIRST HORIZON NATIONAL** | ) | **MAGISTRATE JUDGE GRIFFIN** |
| **CORPORATION d/b/a First Tennessee** | ) | |
| **Bank,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Defendants First Tennessee Bank and First Horizon National Corporation ("Defendant" or "First Horizon") filed a Motion for Summary Judgment (Docket Entry No. 36), to which Plaintiff Richard Riddle ("Plaintiff" or "Riddle") filed a response (Docket Entry No. 44), and Defendant filed a reply (Docket Entry No. 49). This case stems from the termination of Plaintiff's employment by Defendant. Defendant maintains that Plaintiff was fired for a string of performance failures and lack of judgment he routinely exhibited in conducting his investigations and his dealing with other employees. Plaintiff alleges, however, he was terminated for reporting purported violations by a bank employee to his superiors (who in turn were required to report the violations to the United States Treasury Department's Financial Crimes Enforcement Network), continuing to protest Defendant's refusal to report the violations, and continuing to investigate fraudulent activity within the company.

For the reasons discussed herein, Defendant's motion will be granted and this case will be dismissed.

Plaintiff began his employment with First Horizon on approximately July 4, 2006, as a Corporate Security Investigator at the Whites Creek, Tennessee location.[1] For the majority of his employment at First Horizon, Plaintiff reported directly to David Scaff ("Scaff"), Investigations Manager. Scaff, in turn, reported to Sheila Bramlitt ("Bramlitt"), who is head of the Corporate Security department. Plaintiff's job duties as an investigator included the following:

- investigating internal and external events that may result in or have resulted in financial loss to First Horizon or involve employee wrongdoing, which involves conducting interviews, documenting investigative results and providing recommendations for corrective action as appropriate;

- ensuring compliance with regulatory and departmental requirements by reviewing each assigned case for suspicious activity identification and reporting; and

- ensuring cases are researched, documented and completed in accordance with departmental, regulatory and compliance standards.

One of the methods by which Plaintiff and other investigators were assigned cases was in response to the filing of an Electronic Incident Report ("EIR"), which is an electronic outlet for employees of First Horizon to report suspicious activity. First Horizon encourages employees to file EIRs regarding suspicious activity or procedural violations. First Horizon's Corporate Security Internal Fraud Investigations ("Investigation Guidelines") document provides specific

---

[1]    Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Entry Nos. 38, 43 and 48) and related declarations and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

2

steps to be followed during an investigation. The Investigation Guidelines provide that the lead investigator must have a meeting with Employee Services and a second chair investigator prior to interviewing the employee. The Investigation Guidelines also provide that "before the interviews are conducted, the investigator should notify line management." As a general rule, the investigator should inform line management two levels up from the suspect employee, but in rare circumstances (i.e., if two levels up is executive management or line management is out of the office for an extended period of time . . . . ) only one level may be suitable. After the interview, the lead investigator and the second chair should jointly determine whether to suspend the employee; if they are unsure, they should consult with the Investigations Manager or the Corporate Security Manager. If line management, Employee Services and Corporate Security disagree about the employment action, the case should be escalated to the Corporate Security Manager. Upon completion of the investigation, the investigator is required to follow up with the appropriate personnel, which includes Employee Services.

If, as a result of an investigation, the specific case facts dictate that a Suspicious Activity Report ("SAR") is required to be filed with the Financial Crimes Enforcement Network ("FinCEN"), the investigator will complete the SAR form. The criteria for whether activity is reportable via a SAR is set forth in the Suspicious Activity Reporting Procedures Manual, which all investigators are supposed to read every year.[2] The specific types of suspicious activity that are reportable on a SAR are known or suspected insider abuse involving any amount, known or suspected criminal activity with a known suspect and a dollar loss of at least $5,000, known or suspected criminal activity with a dollar loss of at least $25,000, and known or suspected money

---

[2] Prior to his employment with Defendant, Plaintiff had four and one-half years of experience in fraud detection with Citibank where he audited SARs.

laundering with a dollar exposure of at least $5,000. First Horizon's Suspicious Activity Reporting Procedures Section 400 defines insider abuse as follows:

> (1) *Insider abuse involving any amount.* Whenever the national bank detects any known or suspected Federal criminal violation, or pattern of criminal violations, committed or attempted against the bank or involving a transaction or transactions conducted through the bank, where the bank believes it was either an actual or potential victim of a criminal violation, or series of criminal violations, or that the bank was used to facilitate a criminal transaction, and the bank has a substantial basis for identifying one of its directors, officers, employees, agents or other institution-affiliated parties as having committed or aided in the commission of a criminal act, regardless of the amount involved in the violation.

(Docket Entry No. 39-2). Once an investigator completes a SAR, the SAR is directed to Bramlitt for review. Bramlitt then determines whether the SAR should be filed with FinCEN.

Scaff alleges that Plaintiff was an average to below-average performer who continually had issues with the quality of the documentation of his cases and his conduct, as well as dealings with First Horizon employees during investigations. (Docket Entry Nos. 41-5 at 41, 41-6 at 86, 109-111 and 114). Plaintiff disputes these accusations and asserts that Scaff told him that he "was either on the average, depending on what the particular item was, or exceeded in regards to that item." (Docket Entry No. 41-3 at 231). Moreover, Scaff told Plaintiff he "was a good investigator," and Plaintiff received promotions and raises during his employment with Defendant. (Docket Entry No. 41-1 at 60-61).

Purportedly, Scaff first became aware of Plaintiff's issues in mid-2007, when he observed Plaintiff inappropriately interject himself into the investigation of another investigator, Brandi Woodard ("Woodard"). (Docket Entry No. 41-5 at 62, 66). Plaintiff disagrees with this version of events and claims rather that he called Scaff about Woodard to see if he could help after she left her office (next to Plaintiff's) crying saying she had been suspended. (Docket Entry No. 41-

1 at 72). Scaff subsequently spoke to Plaintiff regarding his poor judgment in interfering with the Woodard investigation. (Docket Entry No. 41-5 at 68).

At the same time, Scaff had added concerns regarding Plaintiff, such as his sloppy appearance, which did not portray a professional demeanor.[3] (*Id.* at 74-77). On October 1, 2007, at Scaff's direction, Plaintiff wrote and signed an Individual Action Plan ("IAP") regarding his appearance and his involvement in Woodard's investigation.[4] The IAP included the following language:

> The purpose of the Individual Action Plan is to correct or clarify a perception of impropriety in regards to my personal appearance and/or mannerisms in regards to professional conduct within the corporation. The first step is recognition and cognizance of appearance and mannerisms. . . The second step is to limit opportunities for criticism... By limiting criticisms against my performance and presence, I will not be providing support for such attacks. . . . The third step is to allow any cohorts within the department the opportunity to stand independently… These proposed actions are subject to implementation immediately and I recognize I can and will be held accountable for not acting in the manner proposed by this IAP.

(Docket Entry No. 39-1 at 67).

Kimi Johnson ("Johnson"), another investigator, also reported to Scaff about Plaintiff's handling of an investigation. (Docket Entry No. 41-6 at 88). Johnson reported that Plaintiff did not follow proper protocol during the investigation and that this made her very uncomfortable. (*Id.* at 88-89). Plaintiff disputes he did anything wrong in the investigation with Johnson. (Docket Entry No. 46 at ¶ 5).

On approximately September 18, 2008, Scaff learned that Plaintiff released a video from one of the Corporate Security department's cases to his BUNCO group. According to Plaintiff,

---

[3]  Plaintiff disputes that Scaff ever relayed any such concern to him. (Docket Entry No. 41-1 at 79-80).

[4]  Scaff allegedly advised Plaintiff that he was instructing all of Defendant's investigators to complete IAPs at the time "so that he could show that Corporate Security intends to get along with the rest of the departments." (Docket Entry No. 41-1 at 68, 70).

BUNCO is Banks United to Neutralize Criminal Organizations, a professional organization within the banking and law enforcement industries that exists solely to communicate suspected fraud and criminal activities within the banking community.[5]

In early November 2008, James Powell ("Powell") called Scaff to complain about an investigation, which revealed merely that Powell had forgotten to timely submit expense reports. (Docket Entry No. 41-6 at 127, 129, 169 and 173). Specifically, Powell informed Scaff that Plaintiff told him to go home and complete an expense report that day, which could easily have waited until the next business day. (*Id.* at 129). However, Plaintiff claims he did precisely as Powell's supervisor, Chris Kimler ("Kimler"), directed him to do as Kimler purportedly told Plaintiff that he wanted the issue with Powell closed before Kimler and Powell left for an out-of-town trip the next day. (Docket Entry No. 41-2 at 107, 109). Powell also sent an email to Kimler, stating that he "would like to file a complaint against Rich Riddle of Corporate Security."

Shortly thereafter, in December 2008, Plaintiff was assigned to investigate issues regarding the corporate credit card of an employee in the Wealth Management Division, Kevin Clunan ("Clunan"). Kimler was Clunan's immediate supervisor, and Kimler reported to Tripp Thompson ("Thompson"). A regular Security audit had revealed that Clunan was making cash advances on his corporate credit card. Preceding the interview, Plaintiff spoke with Kimler and left a voicemail for Thompson explaining he had to "conduct an interview with one of his employees and [they] would need to discuss it." (Docket Entry Nos. 41-2 at 99; 41-3 at 180-181). Plaintiff's planned second chair, Woodard, who was intimately familiar with the case, became unavailable, so Plaintiff selected Clay Barnett ("Barnett") as his second chair. Plaintiff

---

[5] Defendant contends BUNCO is a dice game and that Plaintiff's BUNCO group was not affiliated with First Horizon. (Docket Entry No. 37 at 5 fn 4) (citing Scaff Dep. p. 98).

6

discussed the Clunan situation with Barnett for "about an hour" prior to the interview. (Docket Entry No. 41-2 at 121). During the employee interview, Clunan explained that he had miscoded the purchase of gasoline as a "seminar expense" instead of turning in the mileage. Plaintiff also learned that Clunan had made cash advances on his corporate credit card to purchase gift cards for other Bank employees to thank them for providing referrals. Plaintiff suspended Clunan at the close of the interview, telling him the cash advances were improper. Plaintiff attempted but did not reach either Kimler or Thompson following the suspension of Clunan; he did, however, leave voice mails for them. (Docket Entry No. 42-3 at 175).

The day after the Clunan interview, Bramlitt informed Plaintiff that the purchasing of gift cards as gratuities for employees was an acceptable practice in the Wealth Management Division. However, after Plaintiff completed the investigation (and because he never saw a Wealth Management policy in writing allowing the purchase of gift cards), he took the position that Clunan had violated the Bank Bribery Act and reported the same to Scaff, Bramlitt and Paula Hulette ("Hulette"), Employee Services Manager. He conveyed to them that a report by Defendant to the federal government by way of a SAR was warranted. (Docket Entry Nos. 41-2 at 156-157; 41-3 at 159, 164). Bramlitt ultimately told Plaintiff that the Wealth Management Division had its own rules, that Defendant was closing the case and not following it any further and that there were no exceptions. As such, Scaff instructed Plaintiff to close the Clunan case as "incident not reportable per stemmed from cultural issue." Scaff further instructed Plaintiff not to bring up the Clunan SAR at the Security Department's weekly meeting where SARs were discussed. Plaintiff made it clear to Scaff and Bramlitt that he did not agree with Defendant's actions and that he was still going to take action as a company employee. (Docket Entry No. 41-3 at 157). However, Plaintiff did nothing

7

else with regard to the Clunan matter: he did not attempt to meet with Bramlitt's or Hulette's supervisors, he did not attempt to meet with the legal department, he did not attempt to meet with the president or CEO, he did not call the ethics hotline, he did not contact the federal government, and he did not complete a SAR. (Docket Entry No. 38 at ¶61; 37 at 8).

After the Clunan investigation, on January 7, 2009, Scaff issued Plaintiff a written performance counseling based on his various performance failures during the investigation. Specifically, Scaff noted Plaintiff's failure to discuss the case with management two levels above Clunan, Plaintiff's lack of familiarity with guidelines, including Wealth Management practices, Plaintiff's lack of communication at all stages of the investigation, and Plaintiff's poor judgment. (Docket Entry Nos. 41-6 at 101; 41-7 at 213, 215). Scaff told Plaintiff that he had to take a written warning on the case, to keep his head low and that everything would blow over.

Subsequently, on April 23, 2009, Plaintiff told a group of employees during a presentation that filing an EIR was equivalent to filing a police report. Defendant claims this statement was contrary to their policies because it could deter employees from reporting policy violations and suspicious activity. First Horizon received an anonymous complaint regarding this misrepresentation via the ethics hotline. After it received this complaint, Scaff and Bramlitt met with Plaintiff wherein he admitted to stating that filing an EIR is like filing a police report.[6] At that point, First Horizon terminated Plaintiff's employment due to his repeated inability to use good judgment.[7] (Docket Entry Nos. 41-4 at 272; 41-7 at 274).

---

[6] One week prior to the termination, Plaintiff began to investigate and research another alleged Wealth Management credit card abuse case. Plaintiff informed Scaff that "[he] had another Wealth Management case that involved corporate credit cards…" and Scaff responded "[l]et's talk about it in person, I'll be down next week." (Docket Entry No. 41-4 at 246).

[7] In his deposition, Plaintiff testified he felt that he was terminated for reasons unrelated to the Plaintiff or the Clunan investigation, namely, that his termination was a result of Tony

8

<u>**ANALYSIS**</u>

Plaintiff has filed this action for violations of Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VII of the Sarbanes-Oxley Act of 2002 (18 U.S.C. § 1514) ("SOX")[8], and pursuant to 28 U.S.C. § 1367 for violations of the Tennessee Public Protection Act ("TPPA"), T.C.A. § 50-1-304, and Tennessee common law, for wrongful termination in violation of Tennessee public policy. Plaintiff seeks compensatory and punitive damages; reinstatement, if feasible and appropriate; front pay; injunctive relief; reasonable attorney's fees and costs; and other relief. Defendant has moved for summary judgment on all claims.

## I.       Summary Judgment Standard

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox County School Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

---

Thompson, manager for the Middle Tennessee region, using a prior employee investigation as leverage against Corporate Security department in order to avoid personal scrutiny. (Docket Entry Nos. 41-2 at 138; 41-4 at 268-71).

[8] Plaintiff filed an administrative complaint with Occupational Safety and Health Administration ("OSHA") on April 24, 2009. (Docket Entry No. 1-2 at 1).

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed.R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. Sarbanes Oxley Claim

SOX creates a private right of action for employees of publicly-traded companies who are retaliated against for disclosing information about potentially unlawful conduct. The statute states, in relevant part:

> No [publicly-traded company] ... may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee (1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of [18 U.S.C.] section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by ... (C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct)....

18 U.S.C. § 1514A(a)(1)(C). A plaintiff wishing to prevail on a claim under § 1514A must prove by a preponderance of the evidence that "(1) [he] engaged in protected activity; (2) the

employer knew that [he] engaged in the protected activity; (3) [he] suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Allen v. Admin. Review Bd.,* 514 F.3d 468, 475-76 (5th Cir. 2008). To qualify as a protected activity, an employee's complaint must definitively and specifically relate to an instance of mail fraud, wire fraud, bank fraud, securities fraud, a violation of any rule or regulation of the SEC, or a violation of any provision of federal law relating to fraud against shareholders. *Id.* at 476-77. Further, § 1514A only protects an employee's report of conduct that he *reasonably believes* constitutes a violation of one of the six enumerated categories. *Id.* "[A]n employee's reasonable but mistaken belief that an employer engaged in conduct that constitutes a violation of one of the six enumerated categories is protected." *Id.* at 477.

Upon an employee's showing of the four required elements under § 1514A, an employer may avoid liability by showing with clear and convincing evidence that it would have taken the unfavorable personnel action regardless of the employee's protected activity. *Id.* at 476; 49 U.S.C. § 42121(b)(2)(B)(iv). "This independent burden shifting framework is distinct from the *McDonnell Douglas* burden-shifting framework applicable to Title VII claims." *Allen,* 514 F.3d at 476 (internal quotation marks omitted).

### Protected Activity

To constitute "protected activity" under the first element, a plaintiff must "reasonably believe[ ]" that the information he provided constitutes a violation of one of the six categories of laws cited in 18 U.S.C. § 1514A(a)(1). All circuit courts addressing the "reasonable belief" segment agree there is both a subjective and an objective component. *See Day v. Staples, Inc.,* 555 F.3d 42, 54 (1st Cir. 2009); *Welch v. Chao,* 536 F.3d 269, 275 (4th Cir. 2008); *Allen,* 514 F.3d at 477 (5th Cir. 2008); *Harp v. Charter Comm., Inc.,* 558 F.3d 722, 723 (7th Cir. 2009);

*Van Asdale v. Int'l Game Tech.,* 577 F.3d 989, 1000 (9th Cir. 2009); *Gale v. U.S. Dept. of Labor,* 384 Fed. Appx. 926, 929 (11th Cir. 2010). Nevertheless, though reasonable belief is required, because SOX is intended to foster a corporate culture that encourages internal vigilance against corporate wrongdoing, a plaintiff need not show an actual violation or quote a code section he believes was contravened. *Fraser v. Fiduciary Trust Co. Intern.,* 417 F.Supp.2d 310, 322 (S.D.N.Y. 2006). The employee must, however, identify the specific conduct that he believes is illegal, as general inquiries do not constitute protected activity. *Welch,* 536 F.3d at 276–77. Further, because SOX only protects certain disclosures, a plaintiff must prove that the cited conduct "definitively and specifically" relates to one of the classes of laws listed in 18 U.S.C. § 1514A(a)(1). *Id. Mann v. Fifth Third Bank,* 2011 WL 157553, at *3 (S.D.Ohio 2011).

Defendant maintains that Plaintiff did not engage in protected activity under SOX because he did not "step outside his role" as an investor and therefore did not "engage in protected activity." (Docket Entry No. 37 at 10). In support of this assertion, Defendant contends Plaintiff did nothing other than perform his job duties (albeit in a substandard fashion) with regard to the investigation: he did not attempt to meet with Bramlitt's or Hulette's supervisors, he did not attempt to meet with the legal department, he did not attempt to meet with the president or CEO, he did not call the ethics hotline, he did not contact the federal government, and he did not complete a SAR. (*Id.* at 11). Even if Plaintiff were not precluded from asserting a SOX claim due to the fact that he did nothing other than perform his regular job duties, Defendant argues Plaintiff still cannot establish that the activity he engaged in was protected by SOX. (*Id.* at 12). It asserts SOX does not encompass the Bank Bribery Act; even if it did, Clunan did not violate the Act and Plaintiff cannot show he had a reasonable belief that he did. (*Id.*).

12

Plaintiff alleges, however, he engaged in and was terminated for his protected activity for three distinct reasons: (1) reporting purported violations by a bank employee to his superiors (which he believed violated the Bank Bribery Act), (2) continuing to protest Defendant's refusal to report the violations (by filing a SAR) while informing them he would take actions as a company employee, and (3) continuing to investigate fraudulent activity within the company just days before his termination. (Docket Entry No. 44 at 4-5). Plaintiff further attempts to argue, the conduct about which he complained and which Defendant was required but refused to report to FinCEN reasonably involved *bank fraud* as well as fraud against Defendant's shareholders. *See* (*Id.* at 6) (emphasis added). This, however, is not alleged in Plaintiff's Amended Complaint or his deposition testimony. Rather, Plaintiff attempts for the first time to argue this new theory in his response to the summary judgment motion. Accordingly, the Court will not entertain Plaintiff's last minute maneuver. Instead, the Court will conduct its analysis in accordance with Plaintiff's premise (in both his Amended Complaint and sworn deposition testimony) that he believed the Bank Bribery Act was violated.

Plaintiff asserts Clunan's behavior violated the Bank Bribery Act and his report concerning this constitutes protected activity. The Bank Bribery Act makes illegal "corruptly giv[ing], offer[ing], or promis[ing] anything of value to any person, with intent to influence or reward an officer, director, employee, agent, or attorney of a financial institution in connection with any business or transaction of such institution." 18 U.S.C. § 215. The Bank Bribery Act is not one of the specifically enumerated violations covered by SOX; consequently, Plaintiff attempts to "bootstrap" an alleged Bank Bribery Act violation into the "catch-all" shareholder fraud claim.

13

First, the Court is not aware of, nor has the Plaintiff pointed to, any authority indicating that a violation of the Bank Bribery Act is, "at its core", a fraud against shareholders. *See Reyna v. Conagra Food, Inc.,* 506 F.Supp.2d 1363 (M.D.G.A. 2007) (citing *Livingston v. Wyeth, Inc.* 2006 WL 2129794 (M.D.N.C. July 28, 2006)) ("To be protected under Sarbanes-Oxley, an employee's disclosures must be related to illegal activity that, at its core, involves shareholder fraud."). Additionally, courts have required some showing of scienter when a plaintiff asserts that he reported potential shareholder fraud. *Allen*, 514 F.3d at 479-480. Here, even if Plaintiff could morph his alleged Bank Bribery Act violation into a complaint of shareholder fraud, he has not come forth with any evidence that it was Clunan's intent to commit a fraud against the shareholders or that Plaintiff reasonably believed that was Clunan's intent.

Second, and what appears to be the real crux of his complaint, Plaintiff claims he engaged in protected activity by protesting Bramlitt's refusal to report the violations by Clunan via a SAR. Although he does not specifically contend that his opposition to the filing of a SAR is one of the numerated violations of SOX, conceivably he is claiming that the SAR issue is a violation of "any rule or regulation of the Securities and Exchange Commission". However, although Plaintiff "threatens" to step outside his role as an investigator and "provide information or cause information to be provided," relating to the conduct he believes to be illegal, he *never* does. He merely reports the alleged violation to three individuals within the company – Scaff, Bramlitt and Hulette – while in his role as an investigator. To establish protected activity, Plaintiff is required to "step outside his role" and take additional action. *See e.g., Pettit v. Steppingstone Center for the Potentially Gifted,* 2009 WL 284 9127, *8 (E.D.Mich. 2009) (citing *McKenenzie v. Renberg's Inc.,* 94 F.3d 1478, 1486-87); *U.S. ex rel. Scott v. Metropolitan Health*

*Corp.,* 375 F.Supp.2d 626, 644 (W.D.Mich. 2005) (Citing *Yuhasz v. Brush Wellman, Inc.,* 341 F.3d 559, 567 (6th Cir. 2003).

Third, one week prior to the termination, Plaintiff purportedly began to investigate and research another alleged Wealth Management credit card abuse case wherein he informed Scaff of the same. However, Plaintiff admits that his duties as an investigator include "investigation of internal and external evidence that may result in or have resulted in financial loss to First Horizon…." Plaintiff was merely performing his job duties. There is no evidence (nor has Plaintiff made the argument) that he reasonably believed in any way the new investigation constituted a violation of one of the six categories of law cited in 18 U.S.C. § 1514A(a)(1). Therefore, Plaintiff does not prevail on this issue.

Next, and even if Plaintiff was correct that his internal report and/or complaints were covered by SOX, to constitute protected activity, Plaintiff must have *reasonably believed* the Bank Bribery Act was violated (constituting shareholder fraud) and a SAR was required to be filed as a result (creating a violation of the SEC rules/regulations). *Allen,* 514 F.3d at 477. An employee's reasonable belief must be analyzed under a subjective and an objective standard. *Id.* The Fourth Circuit has explained the objective component as requiring a plaintiff to show that "a reasonable person in his position would have believed that the conduct constituted a violation." *Livingston v. Wyeth, Inc.,* 520 F.3d 344, 352 (4th Cir. 2008). The Fifth Circuit and Seventh Circuit stated it thusly: "The objective reasonableness of a belief is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee." *Allen,* 514 F.3d at 477 (5th Cir. 2008) (cited in *Harp v. Charter Communications, Inc.,* 558 F.3d at 723 (7th Cir. 2009)).

15

Plaintiff clearly had a subjective belief that the reported actions constituted violations of the Bank Bribery Act. However, Plaintiff has not proffered sufficient evidence that a reasonable person would have believed that Clunan engaged in such conduct or that it amounted to shareholder fraud. Clunan was simply engaging in bank custom and/or practice that was acceptable within his division. At the time he made his reports, Plaintiff claims he had an *extensive* background in bank fraud analysis and detection. *See* (Docket Entry No. 44 at 1). Prior to his employment with Defendant, he had four and one-half years of experience in fraud detection with Citibank. In such an instance, a reasonable person with the same training and experience would not believe that these actions constituted shareholder fraud.

Furthermore, even though Plaintiff may have had a subjective belief that a SAR should have been filed, a reasonable person in his position would not have believed insider abuse had occurred and therefore filed a SAR precisely as Plaintiff was informed by Bramlitt. A suspicious activity is reportable via a SAR when it is "known or suspected to be insider abuse involving any amount.…" According to the company's policy, insider abuse requires "any known or suspected Federal Criminal violation, or pattern of criminal violations, committed or attempted against the bank.… where the bank believes it was either an actual or potential victim of a criminal violation.…" (Docket Entry No. 39-2). As Defendant maintains and Plaintiff does not disagree, Clunan's conduct was a known and accepted practice in the Wealth Management Division. Given these facts, it was objectively unreasonable to believe criminal activity had occurred and a SAR was required.

As Plaintiff has not engaged in protected activity, the Court need not consider whether he has made a prima facie showing of causation.

*Clear and Convincing Evidence*

Assuming, however, that Plaintiff could establish the essential elements of his Sarbanes Oxley claim, the Court finds that Defendant's Motion for Summary Judgment on this claim should still be granted because Defendant has shown by clear and convincing evidence it would have terminated Plaintiff regardless of his alleged protected activity. Defendant has offered evidence that it decided to terminate Plaintiff only after he repeatedly exercised questionable judgment, concluding with Defendant receiving an anonymous ethics hotline complaint that Plaintiff was telling employees that filing an EIR was equivalent to making a police report (which Plaintiff admitted doing). Taking this evidence into account, the Court finds Defendant has established by clear and convincing evidence it would have terminated Plaintiff despite any protected activity. Absent intentional discrimination, federal courts do not sit as a "super personnel department reviewing the wisdom or fairness of the business judgments made by employers." *Hutson v. McDonnell-Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1996); see also Lewis v. Sears-Roebuck & Co., 845 F.2d 624, 633 (6th Cir. 1988); *Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 70 (6th Cir. 1982).

As such, Defendant is entitled to summary judgment on this claim.

## III.    Common Law and TPPA Claims

It is well-settled that Tennessee recognizes the employment at will doctrine, which the "concomitant right of either the employer or the employee to terminate the employment relationship at any time, for good cause, bad cause, or no cause at all, without being guilty of a legal wrong." *Stein v. Davidson Hotel Co.,* 945 S.W.2d 714, 716 (Tenn.1997). Tennessee courts also recognize exceptions to this doctrine: "In Tennessee an employee-at-will generally may not be discharged for attempting to exercise a statutory or constitutional right, or for any other reason

17

which violates a clear public policy, which is evidenced by an unambiguous constitutional, statutory, or regulatory provision." *Id.* at 717. These exceptions attempt to strike a balance between "the employment-at-will doctrine and rights granted employees under well-defined expressions of public policy." *Id.* Thus, "the tort action of retaliatory or wrongful discharge is available to employees discharged as a consequence of an employer's violation of a clearly expressed public policy." *Id.* To be sure, the Tennessee Supreme Court has "emphasized that the exception to the employment-at-will doctrine must be narrowly applied and not be permitted to consume the general rule." *Id.* at 717 n. 3 (citing *Chism v. Mid–South Milling Co.,* 762 S.W.2d 552, 556 (Tenn. 1988)).

Courts often analyze common law and statutory whistleblower claims together. *See, e.g., Bright,* 2007 WL 2262018, at *3–5; *Williams v. Columbia Hous. Auth.,* No. M2007–1379–COA–R3–CV, 2008 WL 4426880, at *3–5 (Tenn.Ct.App. Sept. 30, 2008); *Moray v. Novartis Pharmaceuticals Corp.,* No. 3:07–cv–1223, 2009 WL 82471, at *7-12 (M.D.Tenn. Jan. 9, 2009); *Treadaway v. Big Red Powersports, LLC.,* 611 F.Supp.2d 768, 783 (E.D.Tenn. 2009); *Smith v. C.R. Bard, Inc.,* 730 F.Supp.2d 783, 797 (M.D.Tenn. 2010). To establish a retaliatory discharge claim under the common law, a plaintiff must prove the following:

> (1) that an employment-at-will relationship existed; (2) that the employee was discharged; (3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy. *Crews v. Buckman Laboratories Int'l, Inc.,* 78 S.W.3d 852, 862 (Tenn. 2002)

18

(citations omitted). Tennessee courts do not "engage in hypothetical guessing to fashion public policy," nor do they "attempt to discern public policy from the common law." *Stein,* 945 S.W.2d at 717 (quoting *Nashville Ry. & Light Co. v. Lawson,* 144 Tenn. 78, 91, 229 S.W. 741, 744 (1921) (with other citation omitted)).

In addition to a common-law action for retaliatory discharge, the TPPA, commonly referred to as the "Whistleblower Act," Tenn. Code Ann. § 50–1–304(a), provides that an employee shall not be discharged solely for refusing to participate in or to remain silent about illegal activities. Tenn. Code Ann. § 50–1–304(b). "Illegal activities" include activities that are in violation of state or federal criminal or civil codes or any regulation intended to protect the public health, safety or welfare. Tenn. Code Ann. § 50–1–304(a)(3). To establish a retaliatory discharge claim under the TPPA, a plaintiff must prove that (1) he was an employee; (2) he refused to participate in, or to remain silent about, illegal activities; (3) he was terminated by his employer; and (4) there is an exclusive causal relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and his termination. *Sykes v. Chattanooga Housing Auth.,* No. E2008–00525–COA–R3–CV, 2009 WL 2365705, at *11 (Tenn.Ct.App. July 31, 2009).

Whistleblower protection is intended to remain a narrow exception to the at-will employment doctrine. *Stein v. Davidson Hotel Co.,* 945 S.W.2d 714, 717 n. 3 (Tenn. 1997); *Chism,* 762 S.W.2d at 556. Therefore, in analyzing a whistleblower case, we are not limited to a determination of whether a law or regulation was violated, *Guy,* 79 S.W.3d at 538, and, indeed, an employee's actions will not qualify him or her for protection merely because the employee has pointed out an illegal activity. *Franklin v. Swift Trans. Co.,* 210 S.W.3d 521, 530-31 (Tenn.Ct.App. 2006). It is the court's task to determine whether the whistleblowing activity that

19

brought to light an illegal or unsafe practice has furthered an important public policy interest. *Guy,* 79 S.W.3d at 538. Toward that end, it is essential that the employee's attempt to expose illegal or unsafe practices do more than merely advance the employee's private interest. *Guy,* 79 S.W.3d at 538 n. 4. Furthermore, while an employee need not report suspected illegal activities directly to law or regulatory enforcement officials, *Emerson v. Oak Ridge Research, Inc.* 187 S.W.3d 364, 371 & n. 1 (Tenn.Ct.App.2005), an employee must make a report to some entity other than the person or persons who are engaging in the allegedly illegal activities. *Emerson,* 187 S.W.3d at 371 & n. 1. *Bright,* No. M2005–2668–COA–R3–CV, 2007 WL 2262018, at *3.

The first three elements of statutory retaliatory discharge are identical to the elements of the common-law claim. *Bright v. MMS Knoxville, Inc.,* No. M2005–2668–COA–R3–CV, 2007 WL 2262018, at *3 (Tenn.Ct.App. Aug. 7, 2007); *Moray,* No. 3:07–cv–1223, 2009 WL 82471, at *7 (M.D.Tenn. Jan. 9, 2009); *Smith,* 730 F.Supp.2d 783, 797 (M.D.Tenn. 2010). However, "[t]he fourth element differs from the common law in that, to benefit from statutory protection, an employee must demonstrate that his or her refusal was the *sole* reason for his or her discharge." *Bright,* 2007 WL 2262018, at *3 (citing *Guy v. Mut. of Omaha Ins. Co.,* 79 S.W.3d 528, 535–37 (Tenn. 2002)) (emphasis added).

If a plaintiff establishes a *prima facie* case under common law or the TPPA, based on direct or circumstantial evidence, showing a causal relationship between the plaintiff's refusal to participate in or to remain silent about an illegal activity and the employer's decision to terminate the employee, the burden shifts to the defendant to come forward with a legitimate, nondiscriminatory reason for its actions. *Provonsha v. Studs. Taking a Right Stand, Inc.,* No. E2007–469–COA–R3–CV, 2007 WL 4232918, at *4 (Tenn.Ct.App. Dec. 3, 2007). If the defendant articulates such a reason, the burden of proof shifts back to the plaintiff to show that

20

defendant's proffered reasons are pretextual or not worthy of belief. *Id.* "To meet this burden, a plaintiff must show by admissible evidence either '(1) that the proffered reason has no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate the discharge.' " *Id.* (citation omitted).

Defendant's argument related to the common law claim is that Plaintiff cannot prove his termination violated public policy. (Docket Entry No. 37 at 18, 21). As to the TPPA claim, Defendant asserts the *prima facie* burden cannot be met because Plaintiff did not engage in whistleblowing and no legal activity occurred in which Plaintiff could have "blown a whistle". (*Id.* at 22). Further, Defendant contends that any alleged public policy compliance was not a substantial factor in the discharge and there is no relationship whatsoever, let alone an exclusive causal relationship, between any alleged or attempted whistle blowing by Plaintiff and his termination. (*Id.* at 21-22). Assuming Plaintiff carries his burden, Defendant argues that a legitimate, non-discriminatory reason existed for its actions and Plaintiff cannot present any evidence of pretext. (*Id.* at 24).

In response to the common law claim, Plaintiff simply makes a conclusory statement that his protected activity is met under Sarbanes Oxley and "in furtherance of the federal Bank Fraud law and Bank Bribery Act." (Docket Entry No. 44 at 13). And he has "clearly raised a genuine material fact whether his attempted exercise of a statutory right.… which violates a clear public policy" was a substantial factor in his termination. (*Id.*). As to his TPPA claim, he purports that he refused to remain silent about illegal activity and was fired as a result. (*Id.* at 12).

Failing to file a SAR is not a violation of "a clear public policy, which is evidenced by an unambiguous constitutional, statutory, or regulatory provision." Furthermore, if the Bank Bribery Act was to evidence public policy, which the Court will assume for purposes of this

motion without deciding, as the Court has discussed above, Plaintiff cannot and has not made a reasonable showing that the Bank Bribery Act (or a SAR reporting requirement for that matter) was violated. For the same reasons explained previously, Plaintiff has not proffered sufficient evidence that criminal or regulatory violations occurred or that a reasonable person with the same training and experience would have believed that it had. Furthermore, although Plaintiff "threatens" to step outside his role as an investigator and report this behavior, he *never* does.

Additionally, Plaintiff has not presented any direct or circumstantial evidence that any alleged protected activity was the <u>sole</u> reason or even a <u>substantial</u> factor for his termination. Rather, Plaintiff maintains there were *three* distinct instances of protected activity leading to his termination - (1) reporting purported violations by a bank employee to his superiors (which he believed violated the Bank Bribery Act), (2) continuing to protest Defendant's refusal to report the violations (by filing a SAR) while informing them he would take actions as a company employee, and (3) continuing to investigate fraudulent activity within the company just days before his termination. (Docket Entry No. 44 at 4-5). Two of his three reasons are not even arguably covered by TPPA or common law retaliation at all. Consequently, even if Plaintiff was correct about the reasons for his termination, summary judgment is appropriate. However, assuming this activity was protected, Plaintiff has not presented sufficient evidence that his alleged protected activity was a substantial, much less the sole factor in his termination. "'Evidence of causation requires more than the facts showing employment, the exercise of rights, and a subsequent discharge. It requires direct evidence or compelling circumstantial evidence. The plaintiff's mere belief or understanding of why he was dismissed, is not sufficient to create a genuine issue of material fact.'" *Provonsha,* 2007 WL 4232918, at *5–6 (citing *McCain v. Airport Honda,* No. 03A01–9603–CV–00099, 1996 WL 557794 (Tenn.Ct.App. Oct. 2, 1996))

(citations and internal quotation marks omitted). Consequently, Plaintiff has failed to prove the causation element under either the TPPA or common law.

Furthermore, if Plaintiff could establish a *prima facie* case of retaliatory discharge, Defendant has articulated a legitimate, non-discriminatory reason for terminating Plaintiff. Defendant has offered evidence that it decided to terminate Plaintiff only after he repeatedly exercised questionable judgment, concluding with Defendant receiving an anonymous ethics hotline complaint that Plaintiff was telling employees that filing an EIR was equivalent to making a police report (which Plaintiff admitted doing). Plainly, Defendant has articulated a legitimate and permissible reason for the employment decision.

As Defendant has proffered a legitimate, non-discriminatory reason for Plaintiff's termination, the burden shifts back to Plaintiff to prove that Defendant's stated reasons are a pretext for retaliatory discharge. Plaintiff has not come forward with sufficient evidence to show the reason for his termination was related to the Clunan investigation. Defendant has provided sufficient evidence of performance failures and lack of judgment Plaintiff exhibited in conducting his investigations. Moreover, Plaintiff's own deposition testimony rebuts his claim of retaliation related to the Clunan investigation wherein he testified he was terminated because of Tony Thompson. Finally, at this point in the analysis, temporal proximity alone cannot fulfill Plaintiff's proof of pretext; temporal proximity is only indirect evidence that may be used to support the assertion of pretext. *Lindsay v. Yates*, 578 F.3d 407, 421 (6th Cir. 2009). Plaintiff merely states that "[temporal proximity and the shifting, pretextual reasons given by [D]efendant for its actions are sufficient to support… his claim" (Docket Entry No. 44 at 12). Plaintiff has produced no evidence that Defendant acted out of retaliatory animus. Even drawing all inferences in the light most favorable to Plaintiff, the factual record shows that Defendant's

proffered reason has ample basis in fact. Plaintiff has not presented evidence of pretext sufficient to create a genuine issue of material fact. Accordingly, for these reasons, the Court concludes that Plaintiff has failed to meet his burden of demonstrating causation under common law and the TPPA.

## **CONCLUSION**

For all of the reasons stated, Defendant's Motion for Summary Judgment (Docket Entry No. 36) will be granted and this case will be dismissed with prejudice.

An appropriate Order shall be entered.

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE